MARY W. WINTERBOTTOM *et al.*

*v.*

J. H. PATTISON *et al.*

*Filed at Ottawa October 29, 1894.*

1. DEEDS—*delivery to third person—when sufficient.* The delivery of a deed to a third person for the benefit of the grantee, if the grantee subsequently accepts the deed, is as good as though made directly to the grantee.

2. SAME—*when grantee's acceptance will be presumed.* Acceptance of a deed by the grantee will sometimes be presumed from the fact that the deed is for his benefit.

3. SAME—*presumption of delivery to and acceptance by infants.* The presumption is in favor of the delivery of deeds to infants, and those alleging the contrary must clearly prove there was no delivery; and the presumption of acceptance of deeds by infants is a rule of law, knowledge on the part of the infant being unnecessary.

4. SAME—*made in voluntary settlements—presumption.* The law presumes more in favor of the delivery of deeds made in the course of voluntary settlements, especially when made to infants, than it does in ordinary cases of bargain and sale.

5. SAME—*rule as to delivery to third person applied.* A father, in accordance with his expressed intention, executed a deed to his daughter Mary for life, with remainder to her children, which deed he kept for some time, frequently looking at it, and speaking of it as "Mary's deed." Shortly before his death, upon again looking at it, he gave it to his daughter Emma, saying, "Put it away, and give it to Mary; it is hers." An hour after the father's death Emma gave the deed to Mary, who accepted and recorded it : *Held,* a sufficient delivery.

APPEAL from the Circuit Court of Grundy county; the Hon. DORRANCE DIBELL, Judge, presiding.

Mr. E. SANFORD, for the appellants :

Where a father makes a verbal agreement with a son to convey to him a tract of land if the son will go and live upon the same, and the son does this, in reliance upon the promise, and makes expenditures upon and improves it, a court of equity will enforce a specific performance of the agreement. *Irwin* v. *Dyke,* 114 Ill. 302.

An equitable title is as good as an unquestioned legal title for defense, in equity, in partition. (*Johnson* v. *Filson*, 118 Ill. 219.) Especially so where the grantees are donees and infants. *Cline* v. *Jones*, 11 Ill. 574; *Walker* v. *Walker*, 42 id. 311.

Under the circumstances in this case no delivery was necessary. *Haenni* v. *Bleisch*, 146 Ill. 266.

A delivery of a deed will be presumed from slight circumstances if the intention of the donor is proven; and the retention of a deed by the donor does not impeach its validity, unless the proof is clear that he did not intend to part with it. *Brinkerhoff* v. *Lawrence*, 2 Sandf. Ch. 400.

The law presumes much more in favor of the delivery of a deed, where it is a voluntary settlement, especially when the grantees are infants, than in ordinary cases of bargain and sale. *Douglas* v. *West*, 140 Ill. 455; *Bryan* v. *Wash*, 2 Gilm. 565.

Acceptance in case of a minor is presumed. The law accepts it for the minor, if for his benefit. 3 Wait's Actions and Defenses, 497.

No formal delivery to the grantee is necessary. If the grantor retains control, but in presence of witnesses declares it to be his deed, it is a good delivery. *Ruskin* v. *Shields*, 56 Am. Dec. 439; *Farrar* v. *Bridges*, 42 id. 439; *Douglas* v. *West*, 140 Ill. 455.

The declarations of a grantor, made either before or after the execution of a deed, are not admissible for the purpose of impeaching the deed, (*Guild* v. *Hull*, 127 Ill. 523,) but are admissible to show the grantor is satisfied. *Burt* v. *Quisenberry*, 132 Ill. 385.

Mr. S. C. STOUGH, for the appellees:

A gift of real estate cannot be presumed from a delivery of possession, without a deed of conveyance. 1 Rich. Ch. 271.

A parol gift of land is inoperative, though possession is delivered to the donee. *Caldwell* v. *Williams*, 1 Bail. Ch.

175 ; *Ridley* v. *McNairy,* 2 Humph. 174 ; *Rucker* v. *Abell,* 8 B. Mon. 566 ; *Hugus* v. *Walker,* 12 Pa. (2 Jones,) 173.

A deed, to be valid as a conveyance of real estate, must be delivered.   A party cannot make a deed for land and retain its custody, and have it operate as a conveyance only after his death.   It takes effect at once, or not at all.   *Blackman* v. *Preston Bros.* 123 Ill. 381 ; *Cline* v. *Jones,* 111 id. 563.

Mr. JUSTICE MAGRUDER delivered the opinion of the court :

This is a bill, filed on January 25, 1892, by J. H. Pattison, guardian of Anna E. Williams, a minor, and subsequently amended by making the minor herself a party complainant, against Mary W. Winterbottom and John Winterbottom, her husband, and their five minor children, and Emma W. Robinson and Edward Robinson, her husband, and Eliza Williams, for the partition of 400 acres of land in Grundy County, alleged to have been owned by Jacob Williams, deceased, in his lifetime, among the heirs of said Jacob, and to remove a deed, dated March 23, 1891, alleged to have been signed and acknowledged by said Jacob, as a cloud upon the title of his heirs.   Answers were filed by the adult defendants except Eliza Williams, and by the guardian *ad litem* of the minor defendants, and a decree was entered in accordance with the prayer of the bill, awarding partition and setting aside the deed and ordering an account as to improvements, etc.   The present appeal is prosecuted from said decree.

Jacob Williams died intestate in Morris, Grundy County, on April 29, 1891, leaving him surviving his widow, Eliza Williams, and, as his only heirs-at-law, two daughters, Mary W. Winterbottom and Emma W. Robinson, and one grand-daughter, said Anna E. Williams, the daughter of a deceased son, named George Williams, who had died in 1884.   Eliza Williams died in March, 1892, after the present bill was filed.   She was a second wife, and not the mother of

any of said above named children.  Jacob Williams owned, at the time of his death, about 820 acres of land besides the 400 acres in controversy, a house and two lots in Morris, and about $20,000.00 in money.  There have been partition and distribution of all the property except said 400 acres.

On March 23, 1891, Jacob Williams procured one Nathaniel McBride, a Notary and surveyor in Morris, to draw a deed, dated as of that day, conveying a life interest in said 400 acres to his daughter, Mary W. Winterbottom, and the fee of each of the five tracts of 80 acres contained in said 400 acres which was known as the homestead farm, to each of the five minor children of said Mary, with a provision, that said life-tenant should not encumber her interest, and said grantees of the fee should not encumber their interests before reaching the age of 21 years.   This deed was signed and acknowledged by Jacob Williams and his wife, Eliza, on March 24, 1891, but was not recorded until April 30, 1891, the day after the death of the grantor. It was kept in the house in Morris, where he lived and died, during the time between its execution and his death under the circumstances hereinafter stated.

The main question in the case is one of fact, and that is, whether there was a delivery of the deed of March 23, 1891, by Jacob Williams in his life time to the grantees named in the deed.   It is contended by appellants, that there was such delivery, and that, under and by virtue of the deed, the minor children of Mrs. Winterbottom are the owners of the 400 acres subject to her life-estate ; while appellees claim, that the deed never took effect for want of delivery, and that the 400 acres are subject to partition among the three heirs of the deceased intestate, namely, his two daughters, Mrs. Winterbottom and Mrs. Robinson, and his grand-daughter, Anna E. Williams.

Mrs. Robinson lived in Missouri.   She arrived at her father's house in Morris on April 12, 1891, and remained there until his death, and after that.   Besides herself the only other inmates of the house appear to have been the

wife, Mrs. Eliza Williams, and a servant, named Lydia Lyons. Mrs. Winterbottom lived on the homestead farm of 400 acres, the land in dispute, which was about seven miles from Morris. In the house was a sitting room, and adjoining the sitting-room was a bed-room, occupied by the deceased. The deed was kept in a bureau drawer in the bed-room. Mrs. Robinson came to Morris at the request of her father, and sat up with him at night and nursed him during his last sickness. He was about seventy years of age, when he died, and quite feeble for some time prior thereto.

Mrs. Robinson was called as a witness by the complainants below, the appellees here, and she swears, that when she first arrived, her father went into the bed-room and brought out the deed and showed it to her; that she took the deed out of the drawer as many as three or four times before his death at his request and carried it to him; that, upon one of these occasions, she read it over to him carefully; that, at the other times, he would look it over and read it aloud, and hand it back to her "to take it back and put it where it belonged;" that, when he first showed the deed to her, he said: "Emma, I want you to see this; it is a deed I made to Mary for the old home, the 400 acres; I have given it to her and her children forever; you read it and see what you think of it;" that she said to him she was glad he had done it, as Mary deserved the old place; that he constantly talked about the deed, and did so at night when she was sitting up with him; that once he sent her to get the deed out of the drawer, and gave his reasons for executing it, saying that he had fixed it, so that nobody could spend the farm or waste it, or take it from her, or the children; that the next time the deed was brought out was on Saturday, April 25, when McBride was there; that they sat in the dining room talking; that she went and brought out the deed at her father's request; that McBride read it over word for word; that, when he had finished, her father handed the deed back to her, and she held it while McBride staid, and then put it back in

the drawer; that her father died on Wednesday, April 29, at seven o'clock in the morning; that on the previous Monday, April 27, about 10 o'clock in the morning, while Mrs. Williams and Lydia Lyons were in the kitchen, her father was sitting in the sitting-room by the table, "feeling very weak and poorly," and told her to go and get her sister's deed, "Mary's deed;" that she went and brought it out, and he put on his glasses and looked it over, and said : "Put it away and give it to Mary; it is hers ; I shall never want it any more ; I would like to live a few years to see how Mary makes it on the old place, but Jake Williams' doom is sealed;" that she took the deed, and put it away in the drawer, and some two or three hours afterward put it under the drawer; that no one knew where she put it; she did not tell her father where she put it because he did not ask her ; that he never asked for it again, nor spoke of it again ; that he never had it in his hands after that ; that that was the last time he ever saw it ; that at that time her sister, Mary, was at home on the farm ; that her sister, Mary, came in from the farm the next evening, Tuesday, April 28, about dark, and was there Tuesday night ; that she did not give Mary the deed that night ; that the house was full of callers until 9 o'clock at night ; that she did not remember that she had any opportunity to see Mary about the deed that night ; that she did not tell her of it ; that that was the only time she saw Mary after she got the deed before her father's death, because her father died next morning, April 29, at 7 o'clock ; that she delivered the deed to her sister an hour or two after her father's death ; that Mrs. Williams did not have the keeping of the deed at any time while she was at her father's house.   Mrs. Winterbottom gave the deed to her husband, who recorded it on April 30.

The evidence tends to show that the deceased was desirous of securing this farm to his daughter, Mary, and her children, because her husband was in the habit of drinking.   It also appears that there was a feeling of mutual dislike between Mrs. Robinson and her step-mother.

If the testimony of Mrs. Robinson is true, there was a delivery of the deed. A deed may be delivered to a third person for the benefit of the grantee, and if the grantee subsequently accepts the deed, the delivery is as good as though made directly to the grantee. The grantee's acceptance will sometimes be presumed from the fact that the deed is for his benefit. (*Rivard* v. *Walker*, 39 Ill. 413; 5 Am. & Eng. Enc. of Law, page 448). Where the grantee is an infant, the presumption of acceptance is a rule of law, and "knowledge of the conveyance and of its acceptance is not necessary." (5 Am. & Eng. Enc. of Law, page 449). In regard to deeds made for the benefit of infants "the presumption of law is in favor of their delivery, and the burden of proof is upon the grantor to show clearly that there was no delivery." "The law presumes more in favor of the delivery of deeds, in case of voluntary settlements especially when made to infants, than it does in ordinary cases of bargain and sale." (*Bryan* v. *Wash*, 2 Gilm. 557; *Rivard* v. *Walker*, *supra*; *Douglas* v. *West*, 140 Ill. 455; *Haenni* v. *Bleisch*, 146 id. 262). Here, the grantees in the deed were the infant children of the grantor's daughter, taking subject to their mother's life interest. The execution and delivery of the deed were consistent with the previous conduct and declarations of the grantor. At his request Mrs. Winterbottom and her husband and children had moved on to the 400 acres on March 2, 1891, about two months before the grantor's death, and were in possession of it from that time until his death. He stated to both his daughters and to a number of witnesses, who testify to that effect, that he intended to give the farm to his daughter, Mary, and her children, and, after they moved upon it, that he had given it to them. We do not think that John Winterbottom or his wife made any such improvements upon the farm as would bring this case under the rule, that, where a father makes a verbal agreement with a son or daughter to convey to him or her a tract of land if he or she will go and live upon the same,

and the son or daughter does this, in reliance upon the promise, and makes expenditures upon it and improves it, in such case a court of equity will enforce a specific performance of the agreement. (*Irwin* v. *Dyke*, 114 Ill. 302). But we merely refer to the conduct and declarations of the deceased as circumstances tending to substantiate the evidence of Mrs. Robinson as to a delivery.

In addition to this, Mrs. Robinson was a witness called by the complainants, and unless the circumstance hereafter mentioned shows to the contrary, had no interest in testifying in favor of her sister and her sister's children.

On August 6, 1891, a partition suit was begun for the partition of the 820 acres, being the acre property owned by the deceased exclusive of the 400 acres; and on September 16, 1891, a decree of partition was entered in said suit. All the heirs of Jacob Williams were parties to this suit. As we understand the record, both the guardian of Anna E. Williams, and Mrs. Eliza Williams, were parties to that suit. No objection was made by said widow and guardian, that the 400 acres were not treated as belonging to the deceased, and were not embraced in the partition. The guardian alleges in the present bill, that he "presented no claim to the property in the deed of March 23, 1891, because he was not so well informed as now of the facts."

We have thus detailed the material evidence and circumstances tending to support the contention of the defendants that there was a delivery of the deed.

The other testimony of the complainants was mainly for the purpose of showing that McBride was at the house of the deceased on Tuesday, April 28, the day before the latter died, and not on Saturday, April 25, the day fixed by Mrs. Robinson as that on which McBride last came to the house. McBride swears that, on the morning of April 28, he started down town and met Joseph Wilson, who said he had stopped at the house of Mr. Williams, and that the latter wanted to see McBride;

that he (McBride) thereupon went to the house of Williams; McBride proceeds as follows : "He (Williams) said * * * that he wanted to fix up the balance of the matters to-day, but that he felt so unwell he would have to put it off for the present.  I told him I was going southeast of Mazon to do surveying, and promised to go that day.  He said, 'Well, come back when you come home.' I told him I might be gone a day, or two, or three, I could not tell.  When I came back I heard he was dead.  This must have been the 28th of April,—the day before he died.  He was sitting on the east stoop and was much exhausted.  He said : 'Come in when you come back.  If I am here, I will have matters fixed up.  If I am not here, I do not know but the law will fix it just as well as I will fix it, but it will cost more to do it.'  Then he said, 'Come into the house and read that deed to me.'  So we went into the sitting room, which is right off opposite the same porch.  He told either Mrs. Williams or Mrs. Robinson, I forget which, to go in and get that deed.  It was in an old bible in the room.  They went in, brought it out and handed it to him.  He handed it to me and I read it to him.  He said, 'Yes; that is just the way I supposed it was.'  Then he said to some one, I forget which, 'Take and put it in there again, where it was,' and after talking a few minutes I came away.  My impression is Mrs. Williams got the deed, and I rather think Emma (Mrs. Robinson) started back with it, but am not absolutely certain. She was there at the house at the time.  Both were backward and forward in the room more or less, but not all the time, I think.  I saw Mr. Williams hand the deed back to either Mrs. Williams or Mrs. Robinson, and heard him tell them to put it back where it was, and I think they started to the next room south, adjoining.  I remember who it was I went out to survey for on the 28th of April,—the day before Mr. Williams died.  It was for a man by the name of Marsh.  I think it was the 28th I went out.  I have no means of fixing the date,—no memo-

randa telling the date I went,—but I think I was out a portion of the next day, and I usually date anything of that kind the day I finish. I have the date that I finished, which was the 29th. I examined it to-day." In regard to what took place on March 24, 1894, when McBride took the deed up to the house and it was signed and acknowledged before him by Mr. and Mrs. Williams, he says : "I told Mr. Williams if he wanted the deed filed I could take it down and hand it in and have it filed. He said, no ; he did not want it done now ; he supposed as long as he kept the deed in his own possession it did not convey any title. When I spoke about filing the deed, he said, 'No, I do not want to do it now, because I have not got through with the arrangement I am making.' He said he wanted to give Mrs. Robinson that property lying south-west of the road out there, but that she, for some reason, did not want it. But he thought it was the most valuable tract he had, and he said he would have to make some other change or arrangement before he finished the matter."

Upon cross-examination McBride is not so positive, that the 28th of April was the day on which he had his last interview with Williams. He admits that he may have said subsequently, that it was three days before the death of Williams, and that he may have been out surveying two days coming home the third day. Two witnesses swear that they heard McBride say on February 23, 1892, that the last time he saw deceased was at least three days before his death.

A witness named Bagley was introduced for the purpose of confirming McBride, who, at the time of testifying, was a feeble old man, seventy-one years of age. Bagley swears, that the surveying was done for himself and not for Marsh, and that it was done on Tuesday and McBride left on Wednesday, but he could not remember the day of the month. A woman named Elderling swears, that she thinks she saw McBride at the house the day before Mr. Williams died, when she was carrying the latter his dinner.

Complainants introduced in evidence a deed, dated September 17, 1891, executed by Mrs. Winterbottom to Mrs. Robinson on the day after the decree partitioning the 820 acres had been entered, and conveying, for an expressed consideration of $1000.00, about 133 acres of the portion of the 820 acres which was set off to Mrs. Winterbottom by the said partition decree. There was no real consideration for this deed. It is sought to make use of its execution in some way to cast discredit upon the testimony of Mrs. Robinson. Mrs. Winterbottom says, that, as her father had given her and her children 400 acres, and had given her brother, George Williams, in his lifetime 320 acres of land in Arkansas, which, on the death of George, had descended to his daughter, the complainant Anna E. Williams, grand-daughter of the deceased, and as her father had intended to give some land to her sister, Emma, but had died without doing so, and Emma was dissatisfied by reason thereof, she concluded to deed her sister 133 acres of the land set off to her, not embraced in the 400 acres. This explanation is confirmed by the testimony of Mrs. Robinson, and we cannot see why it is not reasonable. In one aspect of the case, Mrs. Robinson's testimony was against her own interest because, if the deed of the 400 acres was set aside, she would get one-third of the 400 acres. But, if, when she testified, she expected to get 133 acres not a part of the 400 acres, of which there is no proof, her interest was equally balanced; because it is not shown that the 133 acres deeded her were any more valuable than one-third of the 400 acres.

Stress is laid upon the fact that Mrs. Robinson concealed the deed, and upon one occasion after the death of her father kept silent as to the delivery of the deed to her sister, when the subject was alluded to in the presence of her step-mother. This is not surprising in view of the ill feeling existing between her step-mother and herself. Testimony in the record as to declarations, made by Mrs.

Williams after her husband's death in the absence of Mrs. Robinson, was not competent.

We do not think, that the clear and positive testimony of Mrs. Robinson in this case, together with the other evidence and circumstances tending to confirm it, is overborne by the evidence introduced to contradict it, especially when it is considered that those introducing such contradictory evidence are doing so for the purpose of discrediting their own witness. To affirm the decree of the court below is to brand this witness as a perjurer and as a thief of the deed. The proof does not warrant such a conclusion. Testimony as to the date of an occurrence is often uncertain and unreliable. Witnesses, attempting to fix a date, may be perfectly honest, and yet be mistaken. McBride and Mrs. Robinson do not differ materially in their statements as to what took place upon the occasion of McBride's last visit to Mr. Williams, but only as to the particular day on which the visit occurred.

The decree of the Circuit Court is reversed, and the cause is remanded to that Court with directions to set aside the decree entered, and dismiss the bill.

*Reversed and remanded.*